RHODE ISLAND TURNPIKE &
BRIDGE AUTHORITY

v.

BETHLEHEM STEEL CORP. et al.

No. 81–480–Appeal.

Supreme Court of Rhode Island.

June 4, 1982.

Hogan & Hogan, Edward T. Hogan, East Providence, Sheffield & Harvey, Brian G. Bardorf, Newport, for plaintiff.

Edwards & Angell, John V. Kean, David L. Mayer, Providence, Hynes, Diamond & Reidy, P. C., Leslie A. Hynes, New York City (Howard A. Feldman, Bethlehem, Pa., of counsel), for defendants.

## OPINION

KELLEHER, Justice.

This litigation, which now comes before us for the third time, presently involves cross appeals from a revised judgment entered by a Superior Court trial justice after a hearing and following a second remand. On the prior occasions this controversy has been the subject of two written opinions. They are to be found in 119 R.I. 141, 379 A.2d 344 (1977), and R.I., 415 A.2d 1295 (1980), under the title *Rhode Island Turnpike & Bridge Authority v. Bethlehem Steel Corp.*

A detailed factual recitation is unnecessary except to say that this continuing dispute arises because of the catastrophic failure of paint to adhere to the steel surface of the Newport Bridge. The lack of adhesion was due to the presence of "mill scale" which Bethlehem had failed to remove from the metal notwithstanding its contractual obligation to do so.

In Newport Bridge No. 1, a remand was required because it was evident that the Authority had received some benefit from the original paint job and Bethlehem was entitled to a credit for whatever benefit was bestowed upon the Authority. 119 R.I. at 167, 379 A.2d at 358. A second remand followed Newport Bridge No. 2, where we affirmed the trial justice's determination that Bethlehem was entitled to a 25 percent credit[1] but then sustained the Authority's cross appeal by holding that the 25 percent credit was to be applied solely to the actual cost of applying the paint needed to remedy Bethlehem's negligent surface preparation. No credit was to be allowed for the cost of the sandblasting that was necessary to re-

---

1. Testimony at the first remand hearing established that if the steel work had been properly prepared, the original paint job should have lasted twelve years. The trial justice, in establishing the credit percentage of twenty-five, found that the paint served a useful purpose for three of the twelve expected years.

move the mill scale which had caused the original paint failure. The second remand also authorized the trial justice to require the presentation of additional evidence if he thought it necessary.

When, the litigants appeared before the trial justice after the second remand, it was agreed that an element to be considered in determining the cost of painting was the cost of sandblasting the bridge's surface as part of the normal maintenance that would have been necessitated by the usual wear and tear that would have taken place during the expected twelve-year life expectancy of the original paint job. There was also some concern expressed as to whether the testimony that had been adduced previously could form a basis for a proper allocation of the monies paid to the remedial painter, Oliver B. Cannon & Sons, Inc., to either the painting-expense category or the sandblasting-expense category. Consequently, evidence was presented as to the amount of money that would have been expended for normal maintenance sandblasting and as to how much of the remedial costs incurred by the Authority should be classified as paint or as sandblasting.

Testimony on these issues was given by Cannon's president, Robert B. Roth; Herbert M. Mandell, senior vice president of the engineering firm that had designed the bridge and supervised all phases of the construction and remedial painting; and Cannon's site superintendent, who served in this capacity at the bridge site during 1971 and was responsible for authenticating the daily reports. The superintendent's testimony was presented by way of a deposition. Valentino J. Assetto, a long-time Bethlehem employee who during his career had participated actively in the various facets of Bethlehem's many and varied enterprises, testified in behalf of his employer. His computations in large part were based upon the statistical data found in the 1971 daily work reports.

Roth testified regarding the allocation of costs between blasting and painting during the remedial period, which encompassed a time frame beginning in 1971 and ending in 1977, with the exception of 1974, a year during which no remedial painting was performed. Roth estimated that the normal maintenance sandblasting expenses which would have been incurred during the twelve-year life expectancy of the original paint job would have amounted to $285,-576.03. His testimony, based on his experience with the Newport Bridge and others, served as a basis for the Authority's claim that 65 percent of all payments made to Cannon were attributable to remedial sandblasting. Mr. Mandell told the trial justice that 60 percent of the costs incurred by the Authority for his firm's engineering services were attributable to the remedial-sandblasting operation. Assetto's analysis of the documents presented to him resulted in a different allocation from those offered by Roth and Mandell. He estimated the normal maintenance sandblasting cost at $311,-533 and placed the remedial sandblasting percentage at 27.97 percent. His calculations would have given Bethlehem a credit somewhat in excess of $1 million. In his deposition, the superintendent, besides casting doubts on the accuracy of the assumptions made by Assetto in his computations, stated that, in his opinion, the sandblasting time expended on the bridge during 1971 constituted about 75 to 80 percent of the entire remedial operation.

In analyzing the evidence, the trial justice discussed the different allocations of costs advanced by both the Authority and Bethlehem and the sources of evidence supporting those allocations. He specifically found Assetto's testimony to be unpersuasive because in his opinion it was based on records which were neither intended nor compiled for the purpose for which Assetto used them. The trial justice concluded:

1. The cost of the remedial sandblasting was equal to 65 percent of the total net payment made to Cannon.

2. The cost of the remedial painting was equal to 35 percent of the net payment made to Cannon.

3. The normal maintenance blasting costs subject to a credit for Bethlehem were $285,576.03.

4. 60 percent of the cost for purchasing grit in 1977 was to be placed in the remedial-sandblasting category.

5. 60 percent of the fees paid to Mandell's engineering firm would be attributable to the remedial-sandblasting operation.

After making these factual conclusions, the trial justice turned to matters mathematical. The total net payment made to Cannon by the Authority was $5,059,467.43. The trial justice then applied the 35 percent remedial-paint factor to the total net amount and determined that the true painting cost amounted to $1,770,813.61. He then applied the 25 percent credit factor due Bethlehem to both the $1,770,813.61 cost of remedial painting and the $285,576.03 representing the estimated expense for the routine maintenance sandblasting. After making the necessary addition and multiplication, the trial justice arrived at a credit figure of $514,097.41. Thus, when the $514,000-plus figure was deducted from the total net paid to Cannon, the Authority's net cost was then reduced to $4,545,370.02.

After the trial justice had made additional computations for such items as the grit expense and the engineering fees, the amount due the Authority from Bethlehem was adjusted upward to $4,935,023.90. From this figure must be deducted the $804,996.55 counterclaim of Bethlehem which was upheld in the court's consideration of Newport Bridge No. 1.

At this juncture we should point out that at no time do the litigants challenge the accuracy of the trial justice's mathematics, nor does Bethlehem contest his 60 percent allocations of the engineering fees and the 1977 grit expense. The single disputed issue which is before us concerns the trial justice's allocation of 65 percent of the remedial-painting costs to the sandblasting category.

Bethlehem's appellate argument, when all is said and done, is essentially that the trial justice should have believed the testimony of its witness rather than those offered by the Authority. Such an argument is one that should be made to the factfinder

rather than an appellate court. In rejecting Assetto's estimates, the trial justice noted that his analysis was based upon reports which were "simply not generated in order to determine such an allocation of costs."

Assetto's estimates as to the percentage credits to be allocated for the maintenance and remedial-painting facets of this controversy were based on his study of Cannon's daily report sheets for 1971. Each daily sheet contains the names of various employees and a column where the hours each worked on that day are recorded. On various days there can be found notations against some employees' names reading "Blast 6 hrs." or "Blast 2 hrs." Assetto assumed that the total "Blast" notations which appeared on some of the work sheets indicated the amount of sandblasting performed on that particular day, and with this assumption as a basis he completed his 1971 calculations and then projected them for each of the other years when the repainting took place.

Assetto's assumptions were dispelled when the site superintendent testified at a deposition hearing held in Baltimore, Maryland, on March 11, 1981. The superintendent, who was then retired, made it clear that the various blasting notations simply indicate that a blasting machine had broken down after operating for the enumerated number of "hrs." The superintendent also explained that the daily reports having an absence of any blasting notations indicated that "everything went smooth. The blasters worked a full day."

In rejecting Assetto's testimony, the trial justice relied upon the explanation given by the site superintendent. Bethlehem asks that we reject this reliance because it was given by way of deposition and that we are in as good a position to assess credibility in this instance as the trial justice.

██ Conceding that we are in as good a position as the trial justice in passing upon the superintendent's credibility, we cannot ignore the trial justice's findings. He was called upon to make a factual determination based upon the evidence then be-

fore him. Most of the evidence came from witnesses who appeared in the Superior Court. It was his job to draw the inferences from the evidence before him, including that provided by the deposition. Such factual findings will be accepted by us so long as they are reasonable, logical, and flow from established facts. The fact that a portion of the record consists of a deposition does not give us a license to second guess the trial justice. *Chase v. Blackstone Distributing Co.*, 110 R.I. 537, 545, 294 A.2d 392, 396 (1972). We have examined the superintendent's testimony and, notwithstanding Bethlehem's strenuous and ingenious arguments to the contrary, we see no reason whatsoever to disturb the factual findings made by the trial justice.

■ What was said as to the trial justice's factfinding ability in our consideration of Bethlehem's appeal applies with equal force to the Authority's cross appeal, in which it complains about the 25 percent credit allowed Bethlehem by the trial justice on the routine-maintenance expense of $285,576.03. Although the Authority argues to the contrary, it was never our intent in ordering the second remand that the trial justice would be foreclosed from considering such an issue as the routine maintenance cleaning credit. We specifically authorized the presentation of additional evidence, and the trial justice's maintenance credit certainly was justified in that the original paint job had adhered to the bridge work for three years, thereby saving the Authority an estimated $71,300-plus that might have been spent for "touch-up" sandblasting.

■ We next address the claim by Bethlehem Steel and its surety that the interest rate of 12 percent for prejudgment interest as provided by G.L. 1956 (1969 Reenactment) § 9–21–10, as amended by P.L. 1981, ch. 54, § 1, ought not to be applied to the judgment in this case. There is no merit to Bethlehem's position.

This particular issue is hardly one of first impression in Rhode Island. This court has had several opportunities to pass on the application of § 9–21–10. The statute that was amended in 1981 to impose a prejudgment interest rate of 12 percent, in section 3 of the amending statute, provides as follows:

"This act shall take effect upon its passage and shall be given retroactive as well as prospective effect and shall apply to all cases pending upon the effective date of this act."

Bethlehem argues that we are not required to implement the retroactive proviso of the statute. The same contention was made in *Kastal v. Hickory House, Inc.*, 95 R.I. 366, 187 A.2d 262 (1963), in which this court construed an earlier version of § 9–21–10, and cited recently in *Pray v. Narragansett Improvement Co.*, R.I., 434 A.2d 923 (1981).

"In our opinion the statute is neither ambiguous nor equivocal. It speaks imperatively and directly not to the court but to the clerk who is ordered to add 'to the amount of damages, interest thereon from the date of the writ * * *.' This is a purely ministerial act; it contemplates no judicial intervention. The legislative fiat is explicit and admits of no conditions or reservations. The claim for damages having been duly reduced to judgment the addition of interest is peremptory." *Kastal v. Hickory House, Inc.*, 95 R.I. at 369, 187 A.2d at 264.

The Legislature has amended the statute since *Kastal* on several occasions. The statute is, however, no less clear now than it was when this court decided *Kastal, supra.*

"In the face of a statute so clear and unambiguous there is no room for the application of the usual canons of statutory construction. In such a case the statute declares itself. We may not where no ambiguity exists search beyond the statute for a different meaning. Even hardship does not justify a court in reading into a statute something contrary to its unequivocal language. Only when the legislature sounds an uncertain trumpet may the court move in to clarify the call. But when the call is clear and certain as it is here we may not consider whether the statute as written comports with our

ideas of justice, expediency or sound public policy. In such circumstances that is not the court's business. [Citations omitted.]" *Id.* at 369, 187 A.2d at 264–65.

■ Finally, Bethlehem turns to the constitutions of both the United States and the State of Rhode Island and argues that a retroactive application of § 9–21–10 amounts to denial of its due-process rights. A ready response to such assertions was made about a half century ago in *Funkhouser v. J. B. Preston Co.*, 290 U.S. 163, 168, 54 S.Ct. 134, 136, 78 L.Ed. 243, 246 (1933), where the United States Supreme Court, in upholding the retroactive application of a New York statute calling for interest, noted that the payment of interest was an appropriate subject for legislative action in that it added "an amount commonly viewed as a reasonable measure of the loss sustained through delay in payment." Thus, prejudgment interest serves two purposes: it promotes the early settlement of claims and compensates one for his inability to utilize funds rightly due him. Here, the trial justice, in relying on *Funkhouser*, remarked that in the present context of money markets "it can scarcely be said that a 12 percent rate of interest is unreasonable." We echo those sentiments.

■ We would also note that the due-process clause of our state's constitution, art. I, sec. 10, applies only to the rights of individuals involved in criminal prosecutions and not to civil actions. *Twomey v. Carlton House of Providence, Inc.*, 113 R.I. 264, 271, 320 A.2d 98, 101 (1974); *Avella v. Almac's Inc.*, 100 R.I. 95, 99–102, 211 A.2d 665, 668–70 (1965); *Ajootian v. Housing Board of Review*, 98 R.I. 370, 375, 201 A.2d 905, 908 (1964).

The cross-appeals are denied and dismissed. The amended judgment entered after the decision of the trial justice is affirmed. The case is remanded to the Superior Court.

WEISBERGER[2] and MURRAY, JJ., did not participate.

2. The Turnpike Authority instituted this suit on December 17, 1970, and the controversy first came on for trial on January 16, 1974. The trial justice through the ensuing 85 days of

hearing was our colleague, Mr. Justice Weisberger, who was then the Presiding Justice of the Superior Court. He has continued to act as the trial judge during the two remand hearings.