**BLUE CROSS & BLUE SHIELD OF RHODE ISLAND**

v.

**Beverly E. NAJARIAN, Director of the Department of Administration, in her official capacity as the Chief Purchasing Officer for the State of Rhode Island and Providence Plantations.**

No. 2004–361–Appeal.

Supreme Court of Rhode Island.

Feb. 3, 2005.

Steven Snow, Esq., Providence, for Plaintiff.

· William M. Dolan, III, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

WILLIAMS, Chief Justice.

The controversy before us involves two well-known insurance companies vying to provide the health care plan offered by the State of Rhode Island (State) to about 52,000 state employees, retirees and eligible dependants. Both the plaintiff, Blue Cross and Blue Shield of Rhode Island (Blue Cross), and the defendant-intervenor, UnitedHealthcare (United), submitted bids for the three-year contract expected to commence on January 1, 2005. Shortly after the State tentatively awarded the contract to United, Blue Cross protested the award pursuant to the State Purchases Act, G.L.1956 chapter 2 of title 37. After the State rejected its bid protest, Blue Cross filed a complaint in the Superior Court seeking injunctive relief. Initially, Blue Cross's request for a temporary restraining order was denied but, after a hearing on preliminary injunction, the lower court granted Blue Cross's prayed for relief and the State was enjoined from implementing the contract with United and was ordered to re-solicit bids for the health care contract.

The State and United filed timely appeals to this Court. Upon careful review of the record and after giving the requisite deference to both the awarding authority's decision and the Superior Court justice's findings, we reverse the judgment of the Superior Court and reinstate the contract as awarded to United.

### I

### Facts and Travel

With the state's then-current health care insurance contract with Blue Cross set to expire on December 31, 2004, Beverly Najarian (Najarian), the director of the Department of Administration (department), organized a task force to solicit and analyze bids before recommending an insurance company to her in her capacity as the State's chief purchasing officer. Stephen Johnston (Johnston), the department's deputy director, was named project manager. His first order of business was to hire Hewitt Associates (Hewitt), a consulting firm well-versed in health care policy, to assist in the overall bidding process. A consulting team from Hewitt, led by Robert Kennedy (Kennedy), drafted a proposed Request for Proposals (RFP) that the State accepted after some revision.

The RFP was issued on July 9, 2004, and covered three classes of subscribers: the State's active employees (population I), early retirees (under the age of sixty-five) (population II), and retirees sixty-five years and older (population III). The RFP was almost ninety pages long and required all interested health care vendors to submit detailed proposals. The specific RFP requirements relevant to this lawsuit will be addressed below as needed.

Blue Cross and United were the only companies that submitted proposals by the August 12, 2004 deadline. William Anderson (Anderson), the department's purchasing administrator, opened the sealed bids before the public, as required by § 37–2–18(d) of the State Purchases Act (act). Anderson became involved in the bid process shortly before the bids were submitted, after the purchasing administrator who had issued the RFP went on administrative leave. According to the deposition testimony submitted to the trial justice, Anderson was the only person directly involved in the bid selection process up to that point who had read the state procurement regulations detailing the act.[1]

---

1. Najarian testified that she recently had read portions of the State Purchases Act and was

After the bids were opened, they were sent to Johnston, who was heading the Technical Review Subcommittee (subcommittee). The bids then were sent to Hewitt, which analyzed and scored the various components of the proposals. Hewitt had several questions while reviewing the bids, and, on August 20, 2004, follow-up questions were issued to both bidders. After Blue Cross and United submitted their responses, the State conducted recorded telephone conversations with each bidder to further clarify their proposals and answer any of the insurance providers' questions. On September 20, 2004, Najarian determined that the competitive sealed bids were in excess of the funds available for the contract, and that there were "no additional funds available from any source so as to permit an award to the lowest responsive bidder * * *." Accordingly, the State e-mailed both bidders, asking that they each submit a "best and final" offer. Blue Cross and United both complied.

Shortly thereafter, Hewitt submitted to the subcommittee its analysis, in which United received 81.1 points and Blue Cross received 74.9 points overall. The subcommittee studied Hewitt's report and determined that, of the two, United's proposal was in the best interest of the State. That recommendation was then put before the Architectural, Engineering and Consultant Services Committee (A & E Committee), whose three members were vested with the responsibility of overseeing the bid process of all professional service contracts exceeding $20,000, § 37-2-59, to ensure that it is conducted efficiently and fairly. Two members, Anderson and Johnston, both voted to accept the recommendation of the subcommittee that the contract be awarded to United. The third member, Dr. George de Tarnowsky, a member of the general public appointed to serve on the A & E Committee, voted against the decision.[2] Najarian then reviewed the A & E Committee's recommendation and, to the dismay of Blue Cross, tentatively awarded the contract to United.

At that point, James Purcell (Purcell), the acting president and CEO of Blue Cross, wrote a letter of complaint to Governor Donald Carcieri. The letter was forwarded to Najarian, who forwarded it on to her legal counsel. The letter engendered some discussion between the State and United.[3] After these discussions, United changed its bid (1) to exclude a fee of $0.99 per employee per month (PEPM) for a twenty-four-hour nurse line, and (2) to provide crossover services for population III's Medigap indemnity program free

familiar with it overall, but that she had only an indirect role in the procurement of the health care provider contract. At oral argument before this Court, however, the State expounded on the extensive procurement contract experience available when considering the background of all the members of the Technical Review Subcommittee combined.

2. Doctor de Tarnowsky's rationale for voting against the decision is not relevant to this appeal. He concluded that a stop-loss provision was removed from the contract without notice to the parties. In Dr. de Tarnowsky's opinion, "in all fairness to both parties, taking out a provision of the bid without notifying them did not allow them, either party, to go back and recalculate their bids." Neither the parties nor the trial justice questioned the propriety of the awarding authority's alleged removal of the stop-loss provision from the contract, and we need not consider it now on appeal.

3. There is a discrepancy between the parties about whether the changes that United made occurred before or after Blue Cross submitted a formal bid protest. The trial justice concluded that the off-the-record discussions that led United to change its bid occurred after Purcell wrote a letter to the governor but before Blue Cross submitted a formal bid protest to Najarian.

of charge.[4] Blue Cross filed a formal bid protest with Najarian, who rejected the protest upon the advice of legal counsel.

Blue Cross also filed a complaint in the Superior Court seeking equitable relief enjoining the State from executing the contract to United and forcing the State to resolicit bids. The trial justice allowed the parties to conduct limited discovery in which the parties deposed seven witnesses. The trial justice then considered the deposed testimony in lieu of live testimony, heard oral arguments and considered numerous exhibits presented by the parties. After her deliberations, the trial justice granted the relief Blue Cross had requested.

In explaining her decision, the trial justice found that the State had committed six "wrongful acts":

"1. In violation of the applicable statutory scheme and departmental regulations, the [State] modified the [RFP] after bids were submitted, without notice to [Blue Cross] with respect to offerors' fees for the first year of the contract. [The State] then wrongfully modified [Blue Cross's] bid and evaluated its proposal based upon a higher fee than the one it submitted as its offer. [Hewitt] made these modifications to protect United from possible disadvantage after it had submitted a seemingly non-responsive bid.

"2. In violation of the applicable statutory scheme and departmental regulations, the State modified the RFP by eliminating a material provision pertaining to pharmacy rebates without notice to [Blue Cross]. United offered the State an alternate proposal that would give the [S]tate a credit against adminis-

trative fees rather than a rebate. [The State] embraced that proposal and gave [Blue Cross] no credit whatsoever for its offer of 100% rebate, in spite of its significant monetary value under the existing contract. The State gave United its maximum score for offering the option of a credit. That scoring had the effect of eliminating the rebate provision and modifying the RFP. The State had the opportunity to fairly modify its specifications and remove the rebate provision when the [State] issued its 'best and final' offer, but failed to do so.

"3. In violation of the applicable statutory scheme and departmental regulations, the [State] modified the RFP without notice to [Blue Cross] with respect to fully insured Medicare HMO rates for 2006 and 2007. The RFP specifically requests that the bidders quote rates for all three years with the understanding that they are 'illustrative at this time and have not been determined by CMS, filed, and approved by the federal government at this time.' * * * [Blue Cross] submitted rates for all three years. United's bid was non-responsive and provided rates for only one year, 2005. The State scored the item based solely on the quotes for 2005 and ignored the rates [Blue Cross] submitted for 2006 and 2007. The Court finds that [Hewitt] made these modifications to avoid penalizing United for submitting a non-responsive bid.

"4. The State committed palpable abuse of discretion when it penalized [Blue Cross] merely because the company is subject to regulation by the Rhode Island Department of Business Regulation[](DBR). [Blue Cross] explained

4. Crossover services apply when a Medicare-eligible retiree submits a claim that both the private insurance provider and Medicare will cover. The service entails the private insur- ance provider and Medicare communicating electronically to avoid the retiree being required to submit two separate claims.

that it could not guarantee a portion of its quoted fees for its 'Plan 65,' Medigap indemnity program because it is subject to DBR approval. United is not subject to the same regulations. The [State] met to consider rejecting [Blue Cross's] bid altogether as non-responsive, but opted to accept the proposal and penalize [Blue Cross] when evaluating its bid. The imposition of this penalty illustrates the unfairness of the process, particularly when [the State] forgave actual deviations from the RFP by United without penalizing the offeror.

"5. In violation of the applicable statutory scheme and departmental regulations, the State permitted United to modify its bid after the company submitted its 'best and final' offer. With the lame excuse that the offer required clarification, [the State] contacted United after receiving its 'best and final' bid and gave the company the opportunity to remove an additional charge and lower its quoted rates. United's 'best and final' offer had been clear and unambiguous and did not require clarification.

"6. In violation of the applicable statutory scheme and departmental regulations, the State contacted United off-the-record in anticipation of [Blue Cross's] bid protest and permitted the offeror to modify its 'best and final' bid regarding cross-over services. When evaluating the bids, [Hewitt] erroneously compared the [Blue Cross] bid with a lower cost option submitted by United that did not provide cross-over services. After the tentative contract award to United, [Blue Cross] notified the State of this error. In an effort to defeat [Blue Cross's] bid protest, the State wrongfully contacted United off-the-record and suggested that United modify its 'best and final' offer to provide the cross-over service at no additional charge." *Blue Cross & Blue Shield of Rhode Island v.* *Najarian,* 2004 WL 2821629 at *1–2 (R.I.Super.Dec.1, 2004).

On December 3, 2004, two days after issuing the preliminary injunction, the trial justice entered a permanent injunction effectively obviating the bid awarded to United and forcing the State to begin the bidding process again. By agreement of the parties, the trial justice also consolidated her findings on the request for preliminary injunction with a trial on the merits, pursuant to Rule 65 of the Superior Court Rules of Civil Procedure, thereby rendering a final judgment.

The State and United immediately appealed the lower court's decision and requested expedited review. United also filed a motion to stay the lower court's decision, pending appeal, to allow United and the State to continue implementing the contract given its time-sensitive nature. This Court denied the motion to stay the trial justice's decision enjoining the State from implementing United's contract, granted the motion to stay the order requiring the State to resolicit bids, and granted the motion for expedited review. Oral arguments were held on January 18, 2005.

## II

### Standard of Review

■ Before us is an appeal from a judgment entered pursuant to the parties' agreement to consolidate the hearing for preliminary injunction with a trial on the merits. This case presents a highly unusual situation, however, because the trial justice made her findings of fact and credibility entirely on the basis of exhibits and deposed testimony. At no time did any representative from the State, United or Blue Cross testify before the justice. Nevertheless, it is well settled that findings of fact made by a trial justice, "sitting

without a jury, will be given great weight and will not be disturbed absent a showing that the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong." *Perry v. Garey,* 799 A.2d 1018, 1022 (R.I.2002) (quoting *Bernier v. Lombardi,* 793 A.2d 201, 203 (R.I.2002)). Although this Court is in "as good a position as the trial justice in passing upon" the credibility of witnesses who testified through depositions, we will not ignore the trial justice's findings. *Rhode Island Turnpike & Bridge Authority v. Bethlehem Steel Corp.,* 446 A.2d 752, 755 (R.I. 1982). Thus, we will accept her findings "so long as they are reasonable, logical, and flow from established facts." *Id.* at 756.

■ On numerous occasions this Court has said that the hurdle to be overcome in overturning a decision made by the awarding authority in the public bid process is very high indeed. "It is well settled that, in reviewing the bidding process, the Judiciary will interfere with the award of a state or municipal contract only in the event that the awarding authority has 'acted corruptly or in bad faith, or so unreasonably or so arbitrarily as to be guilty of a palpable abuse of discretion.'" *H.V. Collins Co. v. Tarro,* 696 A.2d 298, 302 (R.I.1997) (quoting *Paul Goldman, Inc. v. Burns,* 109 R.I. 236, 240, 283 A.2d 673, 676 (1971)). "[W]hen officials in charge of awarding a public work's contract have acted fairly and honestly with reasonable exercise of a sound discretion, their actions shall not be interfered with

by the courts." *Id.* (quoting *Truk Away of Rhode Island, Inc. v. Macera Bros. of Cranston, Inc.,* 643 A.2d 811, 815 (R.I. 1994)). The State Purchases Act reaffirms that "[t]he decision of any official, board, agent, or other person appointed by the state concerning any controversy arising under or in connection with the solicitation or award of a contract shall be entitled to a *presumption of correctness.*" Section 37–2–51 (emphasis added).

■ While expressly recognizing the strict requirements that must be met to overturn a public awarding authority's decision, the trial justice below concluded that the contract was awarded in violation of statutory provisions and upon unlawful procedure and that the award was arbitrary and capricious, rising to the level of palpable abuse of discretion. On review, this Court is required both to give deference to the trial justice's findings and to give the awarding authority's determination a presumption of correctness. When these two standards conflict, the statutory presumption of correctness must trump our deference to the trial justice's findings.

### III

### The Law

The purpose of the act is, in part, to "[p]rovide for increased public confidence in the procedures followed in public procurement" and to "[p]rovide safeguards for the maintenance of a procurement system of quality, integrity and highest ethical standards." Section 37–2–2(b)(4)(7).[5]

---

5. General Laws 1956 § 37–2–2 provides:
 "(a) This chapter shall be liberally construed and applied to promote its underlying purposes and policies.
 "(b) The underlying purposes and policies of this chapter are to:
 "(1) Simplify, clarify, and modernize the law governing purchasing by the state of Rhode Island and its local public agencies;

"(2) Permit the continued development of purchasing policies and practices;
 "(3) Make as consistent as possible the purchasing laws among the various states;
 "(4) Provide for an increased public confidence in the procedures followed in public procurement;

Section 37–2–18, entitled "Competitive sealed bidding" governs all non-construction purchases exceeding $5,000.[6] That section requires, among other things, that the public be given notice of the invitation for bids; that all submitted bids be opened publicly; that the contract be awarded with "reasonable promptness"; and that corrections or withdrawals of bids be allowed "only to the extent permitted by regulations issued by the chief purchasing officer." Section 37–2–18(e)(f). Another section of the act, entitled "Negotiations after unsuccessful competitive sealed bidding," sets forth the parameters for requesting "best and final" offers as discussed in the state procurement regulations and permits the State to conduct open negotiations to reach a price that it can afford. Section 37–2–20. The trial justice noted the State's failure to comply strictly with § 37–2–20 and suggested that it proceed under § 37–2–20 in lieu of beginning the process over again under § 37–2–18 after she issued her decision.

The State purchasing officer is vested with the thorny task of balancing the letter of the law found in the act with the reality of pursuing the best deal for the State. Our case law reviewing public procurement contracts has unfolded based on our appreciation for the difficulty in awarding a public contract. Although we hesitate to ascribe meaning to the Legislature's failure to act, we note that the General Assembly has not enacted any legislation since our holding in *H.V. Collins Co.*, 696 A.2d at 305, that would require us to reconsider our ruling that, even if a public official violates the letter of the procurement act, his or her decision is still to be given great deference as long as the au-

"(5) Insure [*sic*] the fair and equitable treatment of all persons who deal with the procurement system of the state;

"(6) Provide increased economy in state and public agency procurement activities by fostering effective competition;

"(7) Provide safeguards for the maintenance of a procurement system of quality, integrity and highest ethical standards; and

"(8) Ensure that a public agency, acting through its existing internal purchasing function, adheres to the general principles, policies and practices enumerated herein."

6. Section 37–2–18 provides in pertinent part:
"(a) Contracts exceeding the amount provided by § 37–2–22 shall be awarded by competitive sealed bidding unless it is determined in writing that this method is not practicable. Factors to be considered in determining whether competitive sealed bidding is practicable shall include whether:

"(1) Specifications can be prepared that permit award on the basis of either the lowest bid price or the lowest evaluated bid price; and

"(2) The available sources, the time and place of performance, and other relevant circumstances as are appropriate for the use of competitive sealed bidding.

"(b) The invitation for bids shall state whether the award shall be made on the basis of the lowest bid price or the lowest evaluated or responsive bid price. * * *

"(c) Unless the invitations for bid are accessible under the provisions as provided in § 37–2–17.1, public notice of the invitation for bids shall be given a sufficient time prior to the date set forth therein for the opening of bids. * * *

"(d) Bids shall be opened publicly at the time and place designated in the invitation for bids. Each bid, together with the name of the bidder, shall be recorded and an abstract made available for public inspection. Subsequent to the awarding of the bid, all documents pertinent to the awarding of the bid shall be made available and open to public inspection and retained in the bid file.

"(e) The contract shall be awarded with reasonable promptness by written notice to the responsive and responsible bidder whose bid is either the lowest bid price, lowest evaluated, or responsive bid price.

"(f) Correction or withdrawal of bids may be allowed only to the extent permitted by regulations issued by the chief purchasing officer."

thority did not act in bad faith, was not "corrupt" and was not so arbitrary or capricious as to amount to a "palpable abuse of discretion."

In *H.V. Collins Co.*, 696 A.2d at 300, 305, this Court reversed a trial justice's declaratory judgment finding that a municipal construction contract awarded by the Barrington School Committee violated G.L. 1956 § 45–55–5, the "Award of Municipal Contracts" statute. (Section 45–55–5 governs competitive sealed bidding for municipal contracts and generally parallels § 37–2–18.)

The Superior Court justice who presided over the trial in *H.V. Collins Co.* concluded that the company that had been awarded the contract, Gilbane, was the third-lowest bidder of the four companies that had submitted bids, but that Gilbane's bid was "materially nonresponsive, fatally defective, and should have been rejected by the school committee." *H.V. Collins Co.*, 696 A.2d at 300. In addition, she found that the school committee's evaluation of the bids was subjective, unfair, and went beyond the scope of the criteria set forth in the RFP; that "the school committee's conduct in evaluating the bids and awarding the contract * * * violated § 45–55–5" and Barrington's Town Charter; and that the school committee's conduct constituted a "palpable abuse of discretion" because it was so unreasonable and patently unfair. *H.V. Collins Co.*, 696 A.2d at 300. Additionally, she found that the school committee's conduct, while evaluating the bids, rose to the level of bad faith when it considered a suggestion made by Gilbane without giving the other bidders ample opportunity to respond. *Id.* at 300–01. Furthermore, the trial justice concluded that "[t]he plain fact [was] that Gilbane was clearly the favorite candidate and was selected in violation of state law in such an arbitrary, capricious, and patently unfair

process as to be a palpable abuse of discretion, manifestly unfair and in bad faith." *Id.* at 301.

The trial justice's diligence in *H.V. Collins Co.* is reflected in her comprehensive and articulate findings. This Court was bound by judicial precedent, however, and our holdings in *Truk Away of Rhode Island, Inc. v. Macera Bros. of Cranston*, 643 A.2d 811, 816 (R.I.1994) (*Truk Away*) and *Gilbane Building Co. v. Board of Trustees of State Colleges.*, 107 R.I. 295, 302, 267 A.2d 396, 400 (R.I.1970), establish that the bar for overturning an authority's award of a public contract is extremely high.

This Court observed that not all criteria set forth in an RFP need be quantifiably reducible to a dollar amount; the awarding authority is permitted "to exercise reasonable, good-faith discretion, and * * * not commit * * * unqualifiedly to the lowest bid." *H.V. Collins Co.*, 696 A.2d at 303 (quoting *Paul Goldman, Inc.*, 109 R.I. at 239, 283 A.2d at 675). In addition, it was noted that "we have never held that an awarding authority is required to disqualify lower bidders before awarding the contract to the company considered the 'better' bidder." *Id.* We also held that the "trial justice was clearly wrong in finding that the award of the contract to Gilbane violated the charter and constituted a palpable abuse of discretion on the part of the school committee" because the school committee acted in good faith and exercised sound discretion. *Id.* at 304.

Next, this Court determined that Gilbane's bid was responsive even though the company did not submit all the information requested in the RFP. *Id.* at 305. We noted that Gilbane offered a suggestion that actually would help the town save money and the school committee adjusted the other bids downward as a result of that suggestion. *Id.* We concluded that "[g]iven

the overall comprehensiveness of Gilbane's bid and the absence of any evidence that the school committee acted in a corrupt manner or in bad faith, * * * the committee did not err in its evaluation of the Gilbane bid * * *." *Id.* "To hold otherwise would place the Judiciary in the position of litigating the award of every state and municipal contract and would place public officials in charge of awarding such contracts in the 'legalistic straightjacket' that this Court denounced" previously. *Id.*

Although it is the most instructive case, *H.V. Collins Co.* is not the only case in which this Court has reinstated a state or municipal contract after determining that the lower court erred in finding a "palpable abuse of discretion." In *Truk Away,* 643 A.2d at 816, we summarized our holdings in similar cases and unequivocally stated that

"government by injunction save in the most compelling and unusual circumstances is to be strictly avoided. In the absence of bad faith or corruption, a finding of palpable abuse of discretion should be approached with *grave caution* and be based upon *much more compelling evidence of arbitrariness or capriciousness than may be found in mere complexity.* We admonish all justices of the Superior Court to exercise great care before issuing an injunction vacating an award of either a state or a municipal contract." (Emphases added.)

*See also Paul Goldman, Inc.,* 109 R.I. at 240, 283 A.2d at 676 (holding that the awarding authority did not err by taking into consideration factors not listed in the RFP before awarding a municipal contract to the second lowest bidder). In *Gilbane*

*Building Co.,* 107 R.I. at 302, 267 A.2d at 400, this Court noted that

"[w]e do not believe * * * that those whose duty it is to contract for the construction of a public improvement should be placed in a legalistic straightjacket. We have long presumed that public officers will perform their duties properly. It is our belief that courts can and will recognize corruption, bad faith, or a manifest abuse of discretion when it appears from the evidence presented in a case. Nevertheless, when officials in charge of awarding a public work's contract have acted fairly and honestly with reasonable exercise of a sound discretion, their actions shall not be interfered with by the courts."

█ We are quite certain that "[a]ny good lawyer can pick lint off any Government procurement * * *." *Andersen Consulting v. United States,* 959 F.2d 929, 932 (Fed.Cir.1992) (quoting 91–1 B.C.A. (CCH) at 117,759). To rise to a showing of palpable abuse of discretion, however, one must establish that not only were there violations of the law but also that those violations were significant. There is little doubt that the public officials charged with overseeing the bid process in this case were to a large extent uninformed, overworked and ill-prepared to tackle such a mountainous task—particularly since those responsible for oversight failed to read and familiarize themselves with the relevant statutory requirements, in violation of the state procurement regulations.

█ Once the contract is awarded, the question on review is not whether errors are committed—surely they were—but indeed whether such errors rise to a level of a palpable abuse of discretion. Blue Cross never alleged bad faith or corruption by the State;[7] nor did the trial justice make

---

7. Counsel for Blue Cross stated on the record: "Certainly fraud which we don't allege here.

I want to make that clear on the record. There is nothing in the record, at least in my

such a specific finding. Thus, we need consider only whether the State's conduct rose to the level of palpable abuse of discretion.

The trial justice below was presented with a complicated and difficult case. She labored fairly and efficiently over the discovery process and was then presented with volumes of deposed testimony and numerous exhibits. We conclude, however, that notwithstanding her thorough review of the record, the trial justice erred as a matter of law by failing to apply the statutorily mandated presumption of correctness standard. Our review of the evidence accepted at trial as well as the factual findings of the trial justice, lead us to a contrary result. We conclude, rather, that the errors committed by the State do not rise to the level of palpable abuse of discretion and reverse the trial justice's decision.

## IV

### Application of the Law

■ Before reaching the six "wrongful acts" discussed at length by the trial justice, we must first address the State's allegation that three of the six issues addressed below were not raised in Blue Cross's bid protest and, therefore, were improperly considered by the trial justice and should not be addressed on appeal. The State argues that we should not consider: (1) whether United's bid was nonresponsive because it failed to submit quotes for fully-insured Medicare HMO rates for "illustrative" purposes only; (2) whether the State wrongfully penalized Blue Cross because it is regulated by the Department of Business Regulation; and (3) whether the State unlawfully requested United to

modify its bid after "best and final" offers had been submitted. We disagree.

At the end of the hearing on preliminary injunction, Blue Cross moved, pursuant to Rule 15(b) of the Superior Court Rules of Civil Procedure, to amend the pleadings to conform with the evidence. The State and United objected, arguing that even if the verified complaint were read broadly to include the points at issue, Blue Cross failed to raise them in its bid protest and should thus be precluded from adding them so late in the proceedings. The trial justice overruled the objections and granted Blue Cross's motion. She concluded that the three points had been addressed in the depositions and that it would not be prejudicial to allow Blue Cross to amend the pleadings at that point. We agree and affirm her decision to grant Blue Cross's motion to amend the pleadings. Accordingly, we conclude that all six of the issues that the trial justice addressed in her decision are properly before this Court on appeal.

### A

### Immature Versus Mature Administrative Fees

■ The first issue dealt with in the trial justice's decision was what she perceived as the State's modification of the RFP after bids had been submitted and without notice to Blue Cross. Specifically, the RFP required the parties to submit a quote for "immature" fees for 2005, and "mature" fees for 2006 and 2007. Under the then-current contract with the State, Blue Cross was responsible for all claims pending, but not yet paid, as of January 1, 2005. Therefore, the companies bidding on the new contract were asked to deduct

view, that suggests there was any corruption here. What the record does disclose, however, was a failure to abide by the rules."

these fees from their total quote for the year. This number is called an "immature" quote. A "mature" quote was then requested for 2006 and 2007, during which years the new contract would presumably cover all claims filed.

Blue Cross complied and also included a mature quote for 2005 "for illustrative purposes only." According to the trial justice, United submitted only mature quotes for all three years. Rather than finding United's quote to be nonresponsive, and without notice to Blue Cross, Hewitt and the State compared the mature quote provided by Blue Cross for 2005 to the only quote supplied by United. The trial justice concluded that (1) United's bid was "seemingly nonresponsive" due to this error and (2) that the State's decision to compare mature quotes constituted an effort "to protect United from possible disadvantage after it had submitted a seemingly non-responsive bid."

The State claims that United had, in fact, submitted an immature bid for 2005 but Hewitt mistakenly compared it to the mature bid submitted by Blue Cross. United agrees that confusion surrounded the issue of "mature" and "immature" fees, but insists that it was Blue Cross that was confused. According to United, the RFP took into consideration that when the three-year contract expired at the end of 2007, the insurance provider selected would be responsible for paying "run-out" claims just as Blue Cross is required to pay "run-in" claims that extend into 2005. What exactly the State intended when it issued follow-up questions asking the parties to "confirm whether administrative fees quoted are mature or immature"—to which United replied "mature"—is a question of fact that we do not reach. We are required to accept the trial justice's findings as true "absent a showing that [she] overlooked or misconceived material evi-

dence or was otherwise clearly wrong." *Fleet National Bank v. 175 Post Road, LLC,* 851 A.2d 267, 273 (R.I.2004) (quoting *Casco Indemnity Co. v. O'Connor,* 755 A.2d 779, 782 (R.I.2000)). Upon careful review of the record, we conclude that the trial justice did not overlook or misconceive material evidence, and thus we adopt her findings on this issue and proceed on the basis that United submitted a "mature" quote contrary to what was requested.

Notwithstanding the State's decision to compare "mature" fees after it requested that "immature" quotes be submitted for 2005, we hold, as a matter of law, that such an error did not rise to the level of palpable abuse of discretion. In *H.V. Collins Co.,* 696 A.2d at 300, the trial justice held that "Gilbanes bid was materially nonresponsive, fatally defective, and should have been rejected by the school committee." The rationale given by the trial justice in this case is strikingly similar. She determined that the States conduct in "modifying" the RFP, "without notice to [Blue Cross]," was a palpable abuse of discretion. We reversed the Superior Court's decision in *H.V. Collins Co.,* concluding that "[g]iven the *overall comprehensiveness* of Gilbane's bid and the absence of any evidence that the school committee acted in a corrupt manner or in bad faith, * * * the committee did not err in its evaluation of the Gilbane bid * * *." *Id.* at 305 (emphasis added). Here, too, the trial justice failed to consider the overall comprehensiveness of United's bid as our opinion in *H.V. Collins Co.* requires. We deem this error.

The RFP was very long and complicated. Naturally, strict compliance with the requirements set forth in the RFP would have been preferable; however, the awarding authority decided to overlook this shortcoming and, instead, for the sake

of determining what was more beneficial for the State, chose to compare the mature quotes that had been supplied by the only two bidders. "In the absence of bad faith or corruption, a finding of palpable abuse of discretion should be approached with grave caution and be based upon much more compelling evidence of arbitrariness or capriciousness than may be found in mere complexity." *Truk Away*, 643 A.2d at 816.

## B

### Pharmacy Rebates

 Second, the trial justice found that *after* the bids were submitted, the State demanded that the parties guarantee the percentage of the pharmacy rebates they would be willing to return to the State for each year of the contract. Blue Cross stated that it would return 100 percent but could not guarantee that figure; United offered to return 80 percent of the rebates, but it, too, was unwilling to provide a guarantee. In the alternative, United offered to keep all of the rebates but to refund $4.50 PEPM in administrative fees. The State accepted United's alternative.

The trial justice determined that the State modified the RFP by giving Blue Cross no credit for its unguaranteed offer to return 100 percent of the rebates and that it was improper for the State to change its method of scoring after the bids had been issued. Blue Cross argues that it had been giving the State 100 percent of the pharmacy rebates under the then-current contract, without a guarantee, resulting in nearly $2 million to the State in 2004.

In *H.V. Collins Co.*, 696 A.2d at 305, we held that a purchasing agent is entitled to consider the value of a bidder who makes cost-saving suggestions. Clearly, Hewitt and the State all found more value in United's offer to return a set amount in administrative fees than an unguaranteed offer to provide potentially higher pharmacy rebates. A business decision of this nature fell within the State's discretion, and the trial justice erred when she found otherwise.

The trial justice concluded that, under Blue Cross's current system of refunding 100 percent of the rebates, the State stands to receive rebates totaling $2 million in 2004 alone. In the alternative, the trial justice calculated United's offer to return $4.50 PEPM as saving the State only $1 million for each year of the contract. What the trial justice overlooks, however, is that the purchasing agent, whose decision is entitled to a presumption of correctness, determined that an unguaranteed rebate offer was worth less than the certainty afforded by United. Although the State may well receive $2 million in rebates for 2004, there is no telling what could happen in the future and what percentage of that figure the State would receive in 2005, 2006, and 2007. Moreover, United's offer would result in reduced administrative fees and up-front cost savings, rather than in future rebates. It is not the role of the Judiciary to speculate or to second guess business decisions of this type. Because we perceive no palpable abuse of discretion as to this issue, we reverse the trial justice's determination.

## C

### Fully–Insured Medicare HMO Rates

 Third, the trial justice determined that United's bid was nonresponsive because the RFP asked the parties to quote rates with respect to fully-insured Medicare HMO rates for the three years the contract would cover, for "illustrative" purposes only since the federal government regulates those rates. United provided a quote only for 2005. Without informing

Blue Cross of its decision, the State decided to score only that first year instead of the three years as set forth in the RFP.

In *H.V. Collins Co.*, 696 A.2d at 305, we refused to hold against Gilbane its failure to submit a cash-flow chart as requested in the RFP because, as Gilbane argued, "the process was in too embryonic a posture * * * '[a] cash flow analysis is, of little significance in a project not yet designed, budgeted or funded.'" The same rationale applies to this issue. This particular factor in the RFP is inconsequential; all parties understood that the number being requested was illustrative only and that the actual figure would depend on future decisions made by the federal government. In a situation in which the RFP is so complex and only two bidders have submitted proposals, the Judiciary will not question an awarding authority's decision to overlook shortcomings of this nature.

Based on our holding in *H.V. Collins Co.*, there is no palpable abuse of discretion on the State's part for declining to assess figures that have no real-life bearing on the contract. This inconsequential decision, combined with "the absence of any evidence that the [State] acted in a corrupt manner or in bad faith," *id.* at 305, leads us to conclude that the trial justice improperly substituted her own judgment in vacating the State's presumptively correct decision. Therefore, we hold the State's acceptance of United's decision to submit purely illustrative quotes for fully-insured Medicare HMO rates only for 2005 hardly rises to the level of palpable abuse of discretion on the part of the awarding authority.

### D

**Plan 65 Medigap Indemnity Program**

■ Fourth, the trial justice found that the State wrongfully penalized Blue Cross because the company is subject to state regulation of its Plan 65 Medigap indemnity program (Plan 65). Blue Cross is a nonprofit hospital and medical service corporation organized under Rhode Island law and subject to its regulation. United is a licensed HMO and health care insurer and is not subject to the same regulation by the Rhode Island Department of Business Regulation. The trial justice was disturbed in particular that the State had considered finding Blue Cross's bid nonresponsive, particularly after overlooking several deficiencies in United's bid.

The State's choice to penalize Blue Cross for its inability to guarantee a quote for its Plan 65, although within its discretion, is troubling, especially given its decision to overlook United's failure to provide fully-insured Medicare HMO rates under similar circumstances. Once again, however, we are reminded that the State's award is given a statutory presumption of correctness, and the issue before us is restricted to determining whether this conduct rises to the level of palpable abuse of discretion. *H.V. Collins Co.*, 696 A.2d at 302.

■ The State has two responsibilities to consider during the procurement process. First, it must conduct the proceedings in good faith in a fair and open manner. Section 37–2–2. Second, it must attempt to get the best deal that it can for the taxpayers. *See H.V. Collins Co.*, 696 A.2d at 303. It follows that the State should be permitted to consider whether it might save money by going with a company not classified as a hospital services organization and subject to DBR regulation. We pause momentarily to note the bad blood that has infected the relationship between the State and Blue Cross over the past year or so. When asked at oral arguments what impact this had on the State's decision to

penalize Blue Cross, the State's counsel wisely declined to speculate whether it had any effect at all. Based on the fact that the State is not accused of acting in bad faith, it is not our place on appeal to question the State's motive in penalizing Blue Cross for its adherence to a State regulation. Therefore, we determine that the State's decision to award fewer points to the insurer that probably will charge more for Plan 65 did not rise to the level of palpable abuse of discretion and that the trial justice erred in ruling to the contrary.

### E

### Twenty–Four–Hour Nurse Line Fee

■ Fifth, the trial justice found that after both companies submitted their "best and final" offers, United was asked to modify its bid to remove a twenty-four-hour nurse line fee of $0.99 PEPM that was added to the "best and final" offer. The twenty-four-hour nurse line had been included at no additional cost in United's original proposal. According to the State, the request was made simply to "clarify" the bid. The trial justice found, however, that the "best and final" offer was clear and that Anderson's subsequent e-mail to United was a suggestion that it modify its bid to make it more attractive. Upon careful review of the record, we conclude that the trial justice misconceived material evidence and that the State's communication with United was, in fact, a request for clarification, permitted by the act, and indeed an obligation of public officials.

We once again are reminded that in situations in which the awarding authority's and trial justice's interpretations vary, the statutorily required presumption that the awarding authority's decision is correct ordinarily should supersede the deference we must pay to the trial justice's finding. We turn to *H.V. Collins Co.*, 696 A.2d at

300, for guidance once more. In that case the trial justice found that "the evaluation of bids by the school committee was subjective, unfair, and included matters outside the criteria in the RFP." *Id.* She further surmised that "awarding the contract to Gilbane violated [the statute] and * * * the [town] charter." *Id.* In this case, the trial justice concluded that

> "[i]n violation of the applicable statutory scheme and departmental regulations, the State permitted United to modify its bid after the company submitted its 'best and final' offer. With the lame excuse that the offer required clarification, [the State] contacted United after receiving its 'best and final' bid and gave the company the opportunity to remove an additional charge and lower its quoted rates."

In *H.V. Collins Co.*, 696 A.2d at 305, we concluded that the trial justice erred in finding a palpable abuse of discretion in the school committee's conduct, and we now conclude the trial justice in this case committed the same error.

After determining that it could not afford to proceed with either of the bids submitted, the State asked the parties to submit "best and final" offers. It defies logic that United, which was one of only two companies in the running for this contract and which had complied overall with every step of the bid process, suddenly would increase its price in the last stage of bidding after the State had determined it could not afford the original bids submitted. Seeing an additional $0.99 PEPM added to the administrative fees previously quoted understandably raised some eyebrows at the department. Thus, it logically followed that Anderson, who was overseeing the bid process, would send a request for clarification. His e-mail was short and to the point, stating:

"In the original ASO fee submission, 24–hour Nurseline services were included in the base ASO fee (the original submission noted that this represented a $0.99 PEPM value). In the 'Best and Final' submission, 24–hour nurseline services are excluded from the base ASO fee and a charge of $0.99 PEPM is indicated. Please confirm that the 24–hour nurseline services are included in the 'Best and Final' base ASO fee and no additional fee applies."

The trial justice determined that "Anderson's e-mail to United, seeking a so-called clarification as to the differences between its initial bid and its 'best and final' offer, was nothing more than a suggestion to the offeror that United reconsider the additional fee and remove it." We hold that the trial justice erroneously found a palpable abuse of discretion in this fifth issue. We are satisfied that the State's follow-up question to United was simply a request for clarification, which implicitly is permitted under the act. We conclude, therefore, that the trial justice misconceived the evidence and wrongly characterized the communications. Indeed, with so many taxpayer dollars at stake it seems to this Court that it would have been irresponsible for the State not to seek clarification.

## F

### Crossover Service Fees

 Finally, the trial justice found that, after the parties had submitted their "best and final" offers, Kennedy erroneously compared a quote submitted by Blue Cross that included so-called crossover services, which are incidental to the Medigap indemnity program, to a quote United submitted that did not include the same services. According to the trial justice, to defeat Blue Cross's bid protest, Kennedy contacted United after tentatively award-ing it the contract and had it modify its bid to include the crossover services, free of charge.

The State asserts that the RFP did not request a quote for crossover service fees and that it was unfamiliar with what crossover services were until Blue Cross brought this to its attention. Blue Cross argues that crossover services were implicitly part of the RFP because Blue Cross had been supplying the same to the State for several years through its existing contract and that the RFP applied to all the services currently being offered. United argues that crossover services were not part of the RFP and that it does not violate the act for a bidder to gratuitously offer additional services to the State after the contract has been awarded.

The trial justice concluded that United's offer to provide crossover services was the result of off-the-record conversations between Kennedy and United, made "for the sole purpose of defeating [Blue Cross's] anticipated bid protest and sustaining the contract award to United. Kennedy's conduct, in this regard, rose to the level of bad faith." We note that just as Blue Cross was careful in its briefs not to suggest that the *State's* conduct rose to the level of bad faith, so too does the trial justice, although she comes close to such a finding by labeling the conduct of Hewitt's employee, Kennedy, "bad faith." What the trial justice interpreted as bad faith conduct on Kennedy's part also may be seen as mere ineptitude due to his failure to read the act and comply with its every requirement, a situation which raises its own concern.

 Any shortcomings on Kennedy's part was not fatal to the bid process. The RFP did not request the parties to provide crossover services. Although it is entirely improper for the State to conduct private

conversations about matters concerned in the RFP with a bidder while the bid process is in progress, nothing prevents a bidder from offering to provide a gratuitous service to the State that was not mentioned in the RFP. *See* Model Procurement Code § 3–202(6) cmt. (8) (2000). Therefore, we conclude that the trial justice erred in her final ruling that a "wrongful act" occurred and, we reverse that determination. There was no palpable abuse of discretion.

### Conclusion

We recognize the unfortunate fact that the State's officials did not handle the task of awarding the State's health care contract with the level of expertise that would be desirable. It is troubling that with a procurement of this magnitude the department was understaffed and those involved were not sufficiently familiar with state procurement laws. Nevertheless, a fair and open bid process was conducted in good faith, and we must afford a presumption of correctness to the State's decision. Any mistakes made during the process simply do not rise to the level of palpable abuse of discretion. Our holding should not be interpreted, however, as implying that under different facts and different findings we would not find bad faith or a palpable abuse of discretion.

For the reasons stated herein, we reverse the judgment of the Superior Court. The permanent injunction shall be vacated and the State and United may implement the contract. The record shall be remanded to the Superior Court.

Justice GOLDBERG did not participate.