DECISION
Before this Court is a motion for summary judgment brought by Plaintiff A.F. Lusi Construction Inc. (Lusi), in its action for a declaratory judgment against the Rhode Island Department of Administration (DOA). Also before the Court is Intervenor-Defendant Gilbane Building Company's (Gilbane) motion to dismiss, or in the alternative, for summary judgment. Lusi seeks, inter alia, a declaratory judgment that § 8.11.2 of the State of Rhode Island's Procurement Regulations (Regulation 8.11.2) is invalid because it conflicts with G.L. 1956 § 37-2-39.
 I Facts and Travel
Regulation § 8.11.2 provides that:
 "[t]he generally preferred method of construction contracting management for all projects shall be a general contractor selected as the lowest responsive bidder based on a lump-sum, fixed fee contract type, and projects utilizing this method shall not require individual written determination of such preference. The use of any other method must be justified in writing to the Purchasing Agent by the requesting agency, stating the reasons why the preferred method may not be used, and the Purchasing Agent may approve or reject such requests at his *Page 2 
discretion." State Procurement Regulations § 8.11.2, 1995 Update, Refiled January 5, 2007 (emphasis added).
Lusi contends that this regulation fails to meet the requirements of the State Purchases Act. See § 37-2-39 (providing that DOA "shall issue regulations providing for as many alternative methods of management of construction contracting as he or she may determine to be feasible, setting forth criteria to be used in determining which method of management of construction is to be used for a particular project . . .").
In the background of Lusi's challenge is a construction project through which the University of Rhode Island (URI) intends to expand its North District Campus. One aspect of that expansion plan is the construction of a new biotechnology and life sciences building (URI project). Officials from URI, with the permission of the DOA, elected to utilize a construction contracting management method called "construction management at risk" (CMAR)[1] in order to construct its new building. In addition to addressing the validity of Regulation 8.11.2, Lusi's complaint also addresses whether the use of CMAR for the URI project is permissible under the relevant statutes and regulations.[2]
CMAR is one of several construction delivery methods. The method appears to be considered an "alternative" method — that is, a substitute for the more commonly used general contractor. Compare Regulation 8.11.2 (stating a preference for use of a general contractor); with § 37-2-39
(referring to "alternative" management methods). It appears that a general contractor does not participate significantly in the design and planning *Page 3 
phases of a project. Rather once the project reaches the final stages of design and planning, a general contractor submits a lump-sum bid of the entire project in order to become the builder.
In comparison, construction management involves significant participation in the preconstruction design and planning of a project. Gilbane's project manager, Lawrence C. Bacher, describes both a "standard" construction management contract and a CMAR contract. (Bacher Aff. ¶¶ 8-10, Apr. 6, 2007.) Under both methods, the construction manager (CM) performs pre-construction services during the design phases of a project in conjunction with the project architect and owner's representatives. Id. ¶ 9. However, such an arrangement typically would not require the CM to hold the contracts with the trade contractors, nor would it require the manager to provide a guaranteed maximum price (GMP) to the owner. See id. Rather, the CM simply acts as the owner's agent for the purpose of arranging contractors to do the work. Id. In a CMAR arrangement, however, the CM arranges trade contractor bid packages, solicits bids on those packages, holds and administers those contracts directly, guarantees a maximum price to the owner based on the contracts, and assumes any warranty obligations to the owner. Seeid. ¶ 10.
Massachusetts provides for the use of "alternative" methods by statute, and defines CMAR as:
 "a construction method wherein a [CMAR] firm provides a range of pre-construction services and construction management services which may include cost estimation and consultation regarding the design of the building project, the preparation and coordination of bid packages, scheduling, cost control, and value engineering, acting as the general contractor during the construction, detailing the trade contractor scope of work, holding the trade contracts and other subcontracts, prequalifying and evaluating trade contractors and subcontractors, and providing management *Page 4 
and construction services, all at a guaranteed maximum price, which shall represent the maximum amount to be paid by the public agency for the building project, including the cost of the work, the general conditions and the fee payable to the construction management at risk firm." Mass. Gen. Laws. c 149A, § 2.[3]
As described below, most of these features were present in the award of the management contract for the URI project. Thus, it appears that the distinguishing features of a CMAR are (1) coordination of trade contractor bidding; (2) holding the contracts with trade contractors; (3) providing a GMP which represents the maximum cost of construction to the public agency; and (4) providing a warranty for all of the work.
On or about February 2006, Robert Weygand, URI's Vice President for Administration, requested that it be authorized to procure a CMAR contract. (Letter of Weygand to Najarian, Feb. 15, 2006, Ex. 2 to Aff. of Beverly E. Najarian, Apr. 6, 2007.)[4] In that letter to the Director of the DOA, Mr. Weygand stated four reasons which purported to justify the use of a CMAR:
 "1. The bulk of the purchasing effort would be taken on by [the] CMAR, significantly reducing the workload of URI and DOA Division of Purchases staff in managing this process and accelerating the processing of these bids. The purchasing would be performed under an appropriate level of supervision by the University's Office of Capital Projects and open to review by DOA staff. Awards for all trade contracts would be made only with University approval.
 2. Trade Contractor payments would be taken on by CMAR. In lieu of the some 35 monthly payments to *Page 5 
process which the University managed during the Ryan/Boss project, the University would have one monthly invoice from CMAR who would be responsible for distribution of payments to the trade contractors after approval by the University. This would significantly reduce the workload of budget and accounting staffs at URI, the Office of Higher Education, and DOA as well as simplify the cash requirement planning.
 3. The CMAR would be held responsible to provide warranties on the work of contracts which they held.
 4. The benefit of the alternate to provide a GMP is that the University acquires a contractual limit to the cost of construction." Id.
He further stated that they were in agreement that "the expedited `competitive negotiation' method of bidding would be the proper process to follow in order to secure a CMAR for this project."[5]Id. That request was formally approved approximately two weeks later. (Letter of Najarian to Weygand, Mar. 2, 2006, Ex. 1 to Najarian Aff.)
The DOA issued Request for Proposals #B06248 (RFP) on April 18, 2006, pursuant to Mr. Weygand's request, which solicited "qualified firms interested in providing comprehensive Construction Management Services, At Risk, to assist the URI in the construction" of the new building and related utilities. (Purchasing Record at D000428-460, Ex. to DOA Obj. to Pl's Mot. Summ. J., Apr. 6, 2007.)
The RFP described the scope of the work to be performed as follows:
 "[URI] has already engaged [Gilbane] to act in the role of Program Manager to work with . . . the Project Architect, to oversee preconstruction services through [the] Design Development [phase]. URI has elected to retain an experienced Construction Management firm to manage the final stages of design and to deliver the project." *Page 6 
 The [CMAR] will assist URI by taking over the project at the beginning of the Construction Document Phase and managing the delivery of the project through occupancy, closeout, and the warranty period." Id. at D000434, ¶ 2.2.
The Construction Document phase services can roughly be described as cost planning, scheduling, and managing subcontractor bids. Seegenerally id. at D000436-39. The CMAR is required to competitively bid subcontractor bid packages. Id. at 000438, ¶ 2.5.9. The Construction Document phase concludes when the CMAR has finished selecting subcontractors based upon their bids, and has arrived at a GMP that is agreeable to URI. See id. at D000436, ¶ 2.4.1. The GMP includes,inter alia, bond/insurance costs, direct construction costs, and the CMAR fee. Id. at D000438, ¶ 2.5.10.
During the Construction phase, the CMAR would be responsible for overseeing construction by assisting "in the selection, hiring, and contract approval of professional firms and specialty consultants, including but not limited to. . . [g]eneral [c]ontractors."Id. at D000441. The CMAR is not "allowed to self perform any portion of the work during the construction phase" but instead is charged with contracting with other parties to do that work. See id. at D000439, 441-442.
On September 15, 2006, the DOA awarded the contract described in the RFP to Gilbane, accepting their offer to serve as the CMAR. (Notice of Contract Purchase Agreement, Sept. 15, 2006, Ex. 4 to Najarian Aff.) The RFP set forth a "two-part contracting process" in which the selected CMAR would
 "provide both Construction Document and Construction Phase services, [but] the nature of work in both these phases is clearly different. Therefore, URI will issue a separate Notice to Proceed and will enter into a separate contract with the selected CMAR for each phase. Prospective offerors should recognize that there is no guarantee that URI will continue the Project into the *Page 7 
Construction Phase nor is there any guarantee that if it does, it will contract for the Construction Phase with the CMAR selected for the Construction Document Phase." (Purchasing Record at D000434.)
The choice of a CMAR was based upon a technical review and a cost comparison. Id. at D000239. Unlike a general contractor submitting a lump-sum bid, this RFP compared each offeror's cost based only upon their management fee, and not the entire cost of the project. That cost would not be determined until the CMAR was selected, the trade contractor bidding process was complete, and a GMP was reached. Three firms responded to the RFP, and their proposals were first graded based upon technical criteria. See id. Lusi did not submit a proposal.[6]
Each of the three proposals achieved a sufficiently high technical rating in order to proceed to the cost phase. Id. The committee then compared the proposed fee for each firm.
Gilbane offered to charge $3,576,746 for its services. Id. at D000241-42.[7] One offer was higher, and one offer was lower than that amount.[8] Because Gilbane's proposal had the second-lowest cost and scored highest in the technical category, the Technical Review Subcommittee recommended that Gilbane be awarded the contract.Id. at D000240. The subcommittee further concluded that Gilbane should initially be awarded a $75,000 contract for the Construction Document phase and that, when the documents were complete, trade contractors selected, and a GMP was reached, Gilbane's award *Page 8 
should be increased by an amount not to exceed $3,501,746[9] plus the cost of construction as described in the RFP. See id. at D000240, 434.
In March 2007, the DOA issued an amended Purchase Agreement which increased Gilbane's award from a $75,000 contract to a $44.69 million contract. (Purchase Agreement Amendment, Mar. 26, 2007, Ex. 5. to Najarian Aff.) Essentially, this marked the official award of the Construction Phase services to Gilbane, in addition to the Construction Document services. That $44.69 million includes the $75,000 Construction Document fee and the costs outlined in Gilbane's final GMP proposal of $44.615 million. That GMP includes a (reduced) $3,386,177 management fee, construction costs, and other components as described in the RFP.See Letter of Mar. 19, 2007 at D000001, 04, Ex. H to Gilbane Mot., Apr. 6, 2007; Purchasing Record at D000438, ¶ 2.5.10.
The DOA and Gilbane had not executed the amended Purchase Agreement for the Construction Phase services when the complaint was filed on March 1, 2007. In its complaint, Lusi made three specific requests for declaratory relief: (1) a declaration that Procurement Regulation § 8.11.2 is invalid because it is inconsistent with the State Purchasing Act; (2) a declaration that the DOA cannot use construction management methods other than a general contractor selected as the lowest responsive bidder based on a lump-sum, fixed-fee contract type, and (3) a declaration that the RFP is invalid to the extent that it pertains to the award of Construction Phase services.
Lusi filed a motion for summary judgment only as to the first request for relief which seeks to declare Regulation 8.11.2 invalid.[10] The DOA responded by objecting to *Page 9 
the Lusi's motion. Gilbane has also objected, and in addition, has moved for dismissal of Lusi's complaint, or in the alternative, for summary judgment against Lusi.
 II Certification
At the April 12, 2007 hearing, this Court inquired as to the desirability of certifying the question(s) involved in this case to the Supreme Court. It then directed the parties to submit short briefs stating their positions on the certification issue. Sections §§ 9-24-25
and 9-24-27 of the General Laws govern certification of questions to the Supreme Court when the parties have filed an agreed statement of facts, or when a matter involves questions of doubt and importance, respectively. As Gilbane has not agreed to a statement of facts, it is § 9-24-27 that applies here.
After considering the positions of the parties and the case law on certification, it has become clear to this Court that certification would not be appropriate. Our Supreme Court has stated that "we will not hereafter entertain certification of questions under § 9-24-27 in proceedings commenced under the Uniform Declaratory Judgments Act."Sweeney v. Notte, 95 R.I. 68, 74 (R.I. 1969). But see Sasso v.Almond, 1996 R.I. Super. LEXIS 132 (R.I.Super.Ct. Jul. 30, 1996) (citing three cases which, although brought under the declaratory judgments act, entertained certified questions).
Even if the declaratory relief sought here were not a barrier to certification, however, the Court finds that it would still be inappropriate to certify this case based upon the requirements articulated in Pierce v. Pierce, 770 A.2d 867, 870 (R.I. 2001) (finding certification appropriate only when the trial justice entertains such doubt about a *Page 10 
question that he or she is unable to reach a satisfactory conclusion thereto).[11] Therefore, the Court will address the motions pending before the Court.
 III Validity of Regulation 8.11.2
Lusi's original motion was directed only at the validity of Regulation 8.11.2. In addition to asserting the validity of that regulation, the Defendants' responses to Lusi's motion address the entire complaint, including the URI project, and are beyond the scope of the regulation's validity. The Court will begin by addressing only the validity of the regulation, and if appropriate, it will take up the other issues later in this decision.
 A. Standing
The DOA and Gilbane argue that Lusi lacks standing to bring this action because it failed to submit a proposal on the URI project. They rely on the State Purchases Act which provides that any person aggrieved "in connection with the solicitation or selection for award of a contract" must file a protest within two weeks after the person knew or should have known of the facts giving rise to the protest. Section37-2-52. They argue that since the RFP was issued in June 2006, it is too late to challenge the regulation.
The Defendants have confused the two issues raised by the Plaintiff's complaint: the facial challenge to Regulation 8.11.2 and the challenge to the URI project. Although the URI project is involved in this litigation, the challenge to the regulation is not in itself a challenge to "the solicitation or selection for award of a contract." See id.
Therefore, even assuming arguendo that it is too late for Lusi to challenge the URI project, this provision is no barrier to challenging the regulation itself. Rather, the only statutory *Page 11 
requirements for bringing a challenge to a regulation are found in the Uniform Declaratory Judgments Act (UDJA) and the Administrative Procedures Act (APA).
Where an agency regulation is at issue, the Administrative Procedures Act provides that the
 "validity or applicability of any rule may be determined in an action for declaratory judgment in the superior court of Providence County, when it is alleged that the rule, or its threatened application, interferes with or impairs, or threatens to interfere with or impair, the legal rights or privileges of the plaintiff." G.L. 1956 § 42-35-7.[12]
Under the UDJA, this Court has the power to "declare rights, status, and other legal relations" of the parties before the Court "whether or not further relief is or could be claimed." G.L. 1956 § 9-30-1. Such declarations "shall have the force and effect of a final judgment or decree." Id. A person may seek such a declaration where that person has "rights, status, or other legal relations" which are "affected by a statute, municipal ordinance, contract, or franchise." Section 9-30-2. However, the Court has discretion to decline to enter such a judgment where it "would not terminate the uncertainty or controversy giving rise to the proceeding." Section 9-30-6.
Both statutes acknowledge that a person can challenge a regulation only if the person otherwise has standing to bring suit. Meyer v. Cityof Newport, 844 A.2d 148, 151 (R.I. 2004) (finding that a "necessary predicate to a court's exercise of its jurisdiction under the [UDJA] is an actual justiciable controversy" which requires a plaintiff with standing to bring suit). Standing is "an access barrier that calls for the assessment of one's credentials to bring suit." See, e.g.,Blackstone Valley Chamber of Commerce v. *Page 12 Public Utils. Comm'n, 452 A.2d 931, 932 (R.I. 1982). It is a separate inquiry from whether the person is entitled to relief, and the basic requirement is that a plaintiff must have alleged "such a personal stake in the outcome of the controversy as to ensure concrete adverseness that sharpens the presentation of the issues upon which the court depends for an illumination of the questions presented." Id. at 933 (citingBaker v. Carr, 369 U.S. 186 (1962)).
Stated differently, the Plaintiff must have alleged a sufficient "injury in fact" to be entitled to a determination on the merits.Associated Builders Contrs. of R.I. v. Dep't of Admin., 787 A.2d 1179,1185 (R.I. 2002) (noting that the line is not between "a substantial injury and an insubstantial injury," but rather, between "injury and no injury") (citations omitted). Such an injury must be "concrete and particularized" and "actual or imminent," and not merely "conjectural or hypothetical." Meyer, 844 A.2d at 151.
Lusi alleges that it is a prospective bidder/offeror on state construction contracts. (Compl. ¶ 1.) It further alleges that it is "harmed by [Regulation 8.11.2] because it interferes with Lusi's legal right and privilege to bid on public projects and to be evaluated as a prospective bidder." The Court is satisfied that this status is sufficient to confer standing on Lusi to challenge Regulation 8.11.2.
The State Purchases Act, G.L. 1956 §§ 37-2-1 to 37-2-79, governs "every expenditure of public funds by any state governmental entity except as otherwise provided by law." Section 37-2-4. The purposes of the act are,inter alia, to provide for increased public confidence in the public procurement procedures, to insure the fair and equitable treatment of persons who deal with the procurement system, and to provide for *Page 13 
increased economy by fostering competition. See § 37-2-2(b)(4) to (8). These various purposes are often competing with each other, and the Act's provisions represent the General Assembly's judgment as to the appropriate balance of those policies.
As described above, there are several different methods of construction contracting management, each of which contemplates a different allocation of burdens between the State and the construction manager. As illustrated by the URI project's RFP, the use of a CMAR places a high degree of risk on the manager. For whatever reason, Lusi is incapable or unwilling to become a CMAR, but may be willing and capable to be a general contractor. (Dep. of Armand P. Lusi 173:21-22, Apr. 4, 2007, Ex. 7 to Appx. To Gilbane Mot., Apr. 6, 2007.) If Lusi is correct that the challenged regulation is inconsistent with the State Purchases Act, and does not permit methods other than a general contractor under these circumstances, then Lusi will have suffered the requisite economic harm.
Lusi's status is distinct from a simple taxpayer. Although such a taxpayer has an interest in making sure that public funds are spent efficiently and that the procurement system is conducted with integrity, such an interest is unlikely to be sufficiently personalized to confer standing. See, e.g., Meyer, 844 A.2d at 151 (finding no injury in fact where the plaintiffs' status was no different than that of all members of the community as a whole). In contrast, however, Lusi has a significant economic interest in being permitted to contract with the State under the conditions provided by the statute. Therefore, the Court finds that Lusi has alleged a sufficient injury in fact to confer standing.[13] *Page 14 
 III Requirements of the State Purchases Act
Having found that Lusi has standing to challenge the validity of § 8.11.2, the Court will now address whether its claims have merit. Lusi contends that the DOA has not complied with § 37-2-39 of the State Purchases Act, which states that the
 "chief purchasing officer shall issue regulations providing for as many alternative methods of management of construction contracting as he or she may determine to be feasible, setting forth criteria to be used in determining which method of management of construction is to be used for a particular project, and granting to the purchasing agent . . . the discretion to select the appropriate method of construction contracting for a particular project, provided, however, that the chief purchasing officer shall execute and include in the contract file a written statement setting forth the facts which led to the selection of a particular method of management of construction contracting in each instance." Section 37-2-39 (emphasis added).[14]
It is undisputed that the DOA has promulgated regulations, so the question is whether or not those regulations comply with this provision.
When the language of a statute is clear, the Court's task is merely to apply the plain meaning of the statute. See, e.g., Gilbane Co. v.Poulas, 576 A.2d 1195, 1196 (R.I. 1990). The word "regulations" is modified by three clauses which are set off by commas. The statute requires that there must be regulations, and that those regulations must "provid[e] for. . ., set forth criteria. . ., and grant. . . ." Section 37-2-39. Lusi relies upon the first two clauses for its requested relief. *Page 15 
The first clause requires that the regulations shall provide for however many alternative methods the chief purchasing officer deems "feasible." See id. Regulation 8.11.2 does not explicitly provide for "alternative" methods at all. It provides only for one "preferred" method — i.e, a general contractor with a lump-sum, fixed fee contract.[15] To the extent that it purports to allow other alternative methods — for example, construction management, CMAR, design build — it does not name or describe them, but simply prescribes a procedure for utilizing them. Lusi has suggested, therefore, that only the general contractor method has been deemed "feasible" in the regulations and that other methods are invalid. The DOA argues in response that such an interpretation would unduly constrain DOA's options for utilizing new, evolving management methods. The question, therefore, is whether every feasible method must be enumerated in the regulations, or whether the regulation may provide an ad hoc determination of feasibility in every case.
The Court finds that Lusi has the better of this argument. The statute makes clear that it is the regulations which shall provide for the various management methods deemed feasible by the chief purchasing officer. Although a purchasing agent is permitted to make decisions with respect to the appropriate method for a particular project, only the chief purchasing officer has the power to issue the regulations. Therefore, the legislature intended that the chief purchasing officer would determine initially which methods were feasible, and state them in the regulations. Regulation 8.11.2 only identifies one management method — a general contractor — which presumably has been determined to *Page 16 
be feasible. If the requirement of this statute is too burdensome or restrictive for the DOA, the only answer is to seek recourse from the legislature. However, § 37-2-39 requires a feasibility determination before authorizing the use of alternative methods. Therefore, the Court will issue a declaration that the DOA may not utilize methods of construction such as CMAR until and unless the chief purchasing officer sets forth regulations providing that such a method is feasible.
Whether or not the proposed method is named or described in the regulations, the second clause clearly requires that criteria be set forth in the regulations for choosing which of the feasible methods will be used on a particular project. As a simple matter of grammar and statutory construction, the phrase "setting forth criteria" modifies the word "regulations." Therefore, if the regulations do not set forth criteria, then they are not in compliance with the statute.
Lusi contends that Regulation 8.11.2 is the only attempt in the regulations to comply with § 37-2-39, but that it is defective because it contains no criteria. The Court agrees with Lusi on this point because it has not found anything in Regulation 8.11.2 that can be described as "criteria" under any reasonable definition of the word.See Merriam-Webster's Collegiate Dictionary 274 (10th ed. 2001) (defining criteria as "standard[s] on which a judgment or decision may be based"). Nor have the DOA or Gilbane directed this Court to any other part of the regulations which provide criteria for choosing a construction contracting management method. At best, Regulation 8.11.2 contains procedures for adopting alternative methods, but procedures are not criteria.
The Defendants have pointed to many other sections of the Purchasing Act and the regulations which purportedly contain criteria that would satisfy § 37-2-39. However, *Page 17 
these provisions are not relevant. For example, they have pointed to Regulations 5.11.4.3 and 7.8.1.1 to 7.8.1.4, which are criteria used to evaluate whether a particular offeror is sufficiently qualified to provide the requested product or service. However, the criteria required by § 37-2-39 are used to determine what type of service or product the state is going to purchase — i.e. a CMAR or a general contractor — not the source from which it will be purchased.
The Defendants have advanced many other arguments as to why Regulation 8.11.2 is valid, but most require the Court to disregard the plain language of the statute. For example, the Defendants argue that §37-2-39 provides the purchasing officer with wide discretion to choose between construction contracting management methods. This clearly is true, based upon the third clause of § 37-2-39. However, the second clause of that same provision also provides that the regulations will state criteria — i.e., standards — which must inform the purchasing officer's discretion and provide boundaries to that discretion. That the statute provides for the exercise of discretion does not excuse the absence of criteria.
The Defendants have also suggested that the criteria used to determine the appropriate method of construction contracting management must be tailored to the requirements of individual projects, and may be found in individual requests for proposals. This argument is inconsistent with the scheme set forth in the statute, however. Before producing a request for proposals, the purchasing agent must first determine which type of service to solicit in that request. The criteria are the standards which the purchasing agent must use to make that decision, and by which others may *Page 18 
evaluate the merits of that decision. Such criteria are useless if they are first developed after the decision has already been made.
It may be that the agent, in the proper exercise of his or her discretion, will choose different methods in different cases. In doing so, that officer will "include in the contract file a written statement setting forth the facts [not the criteria] which led to the selection of a particular method. . . ." See § 37-2-39. Those facts should be responsive to the criteria in the regulations. However, although the facts and the outcomes may vary from case to case, the relevant criteria are expected to be relatively constant. A fixed set of criteria was deemed necessary by our legislature as part of its plan to increase public confidence in the procurement system, insure fair and equitable treatment of participants in that system, and to achieve a high degree of quality and integrity in that system. See § 37-2-2(4), (5), and (7). Because they are to be found in the regulations, the criteria may only be changed through the administrative process.
Finally, the Defendants have invoked the doctrine that an agency is due a high degree of deference in interpreting statutes which they enforce. See, e.g., Labor Ready Northeast, Inc. v. McConaghy,849 A.2d 340, 344 (R.I. 2004) (noting that "a court reviewing the agency's interpretation of the statute as applied to a particular factual situation must accord that interpretation weight and deference" when that interpretation is not clearly erroneous or unauthorized) (citations omitted). However, § 37-2-39 is not reasonably susceptible to multiple interpretations. It is one thing to interpret an ambiguous statute, but it is quite another to vary, contradict, or ignore the clear and mandatory language of a statute. *Page 19 
The circumstances of the URI project are instructive. In this case, the Weygand letter sets forth four reasons why use of a CMAR was desirable. (Letter of Weygand to Najarian, Feb. 15, 2006, Ex. 2 to Aff. of Beverly E. Najarian, Apr. 6, 2007, quoted above.) The stated benefits of using a CMAR involve (1) the administrative burden on the public agency, (2) the responsibility for managing the trade contractors, (3) responsibility for warranties, and (4) the effect on the overall cost of the project. These four items might well be relevant criteria that should appear in section 8.11 of the State Purchasing Regulations. However, they are not listed there.
More importantly, it is not known whether these are the only relevant considerations that should inform a purchasing officer's decision to utilize a particular management method.[16] The reason it is not known is because the legislature delegated the responsibility for listing those criteria to the DOA, and the DOA has not done so. For example, a relevant consideration might involve the degree to which public confidence may be decreased, competition impaired, and transparency impeded, when a private entity coordinates the trade contractor bidding process. See § 37-2-2(4), (5), and (7). Through the process outlined by the APA, and with the participation of the relevant interest groups, many other relevant criteria might be identified which are not addressed in Mr. Weygand's letter. In addition, such criteria might move the chief purchasing officer to find that a particular method — such as CMAR — is not feasible for public construction management contracts.
Lusi's position may not ultimately carry the day. It may be that regulations consistent with § 37-2-39 would ultimately provide for the use of a CMAR in many *Page 20 
cases, including the URI project. On the other hand, it may be that use of a CMAR is a bad idea in certain cases. It may even be that § 37-2-39
is a poorly conceived statute that ought to be changed. These are questions to be resolved in the legislative and administrative arenas, however, and not in this Court. As the law stands now, Regulation 8.11.2 does not meet the requirements set forth in § 37-2-39. Therefore, the Court will enter a declaratory judgment that Regulation 8.11.2 is invalid because it purports to allow methods for construction contracting management, other than a general contractor, without identifying methods which are deemed feasible. Further, the regulation is invalid because it fails to set forth criteria for choosing between alternative methods on a particular project.
 IV Gilbane's Motion
Gilbane has moved under Rule 12(b)(6) to dismiss Lusi's complaint for failure to state a claim, or in the alternative, for summary judgment. Gilbane has presented affidavits and other factual materials in support of its motion, so the Court will treat it as a motion for summary judgment. See Super. R. Civ. P. Rule 12(b). As noted above, the Court finds that Lusi is entitled to relief on its challenge to the validity of Regulation 8.11.2, and so it denies Gilbane's motion to the extent that it seeks a contrary result. Gilbane's motion also seeks summary judgment in its favor to the extent that Lusi's complaint applies to the URI project. Lusi's third claim for relief seeks a judgment declaring that the sections of the RFP for the URI project "pertaining to the award of a contract for the Construction Phase services are invalid." (Compl. at 5.)[17] Lusi contends *Page 21 
that the choice of a CMAR management method was improper because of the flaws in Regulation 8.11.2, described above.
Lusi's main grievance with the process is exhibited by the deposition testimony of its owner. (Dep. of Armand P. Lusi, Apr. 4, 2007, Ex. 5 to Lusi Response Mem., Apr. 11, 2007.) That testimony indicates that, while Lusi was not interested in becoming the construction manager, Lusi did seek to bid on the construction portions of the project. Id. at 55:13 (indicating no interest in bidding on the RFP); 56:10-12, 68:20-69:4 (stating that Mr. Lusi expressed interest to Gilbane in bidding as a general contractor). In order to do that, it had to submit bids on work which was scoped and managed by Gilbane, and advertised through its proprietary website in late 2006 and early 2007. See id. at 70:25-72:25. The record is unclear as to whether Lusi properly followed the procedures to participate, and whether those procedures were fairly administered.[18]
Gilbane seeks summary judgment on three grounds: (1) that Lusi lacks standing to challenge the award of the RFP; (2) that Lusi failed to exhaust its administrative remedies; and (3) that Lusi has failed to demonstrate that the award of the RFP to Gilbane constituted a "palpable abuse of discretion."
 A. Standard of Review
Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to *Page 22 
judgment as [a] matter of law." Super. Ct. R. Civ. P. Rule 56(c). The Court "does not pass upon the weight or the credibility of the evidence." Palmisciano v. Burrillville Racing Ass'n, 603 A.2d 317, 320
(R.I. 1992). Instead, it must consider the evidence "in a light most favorable to the party opposing the motion," which in this case is Lusi.See id. "If there are no material facts in dispute, the case is ripe for summary judgment." Richard v. Blue Cross Blue Shield, 604 A.2d 1260,1261 (R.I. 1992).
 B. Standing
The Court notes its earlier discussion on the law of standing, and will address whether Lusi has properly alleged a sufficient injury in fact. Lusi seeks a declaration with respect to the Construction Phase services contracted with Gilbane in March 2007. Lusi contends that it did try to bid for the work through Gilbane in late 2006. Lusi further alleges that, but for the allegedly improper use of a CMAR, it could have and would have bid on the work for the URI project. The Court finds that these are sufficient allegations of economic injury to confer standing on Lusi. See Associated Builders Contrs. of R.I. v. Dep't ofAdmin., 787 A.2d 1179, 1185 (R.I. 2002) (finding standing based upon allegations that potential contractors were improperly excluded from the bidding process).
Gilbane argues that because Lusi never participated in the original RFP process, that it cannot possibly claim that it was injured because of the award to another firm. However, Lusi and other similarly situated contractors could reasonably have believed that they could still participate in the process to bid for the actual building work involved in the URI project, even if they did not want to become the construction manager. See Purchasing Record at D000434, ¶ 2.4 (containing the RFP which stated, inter alia, that *Page 23 
there was "no guarantee that URI will continue the Project into the Construction Phase nor is there any guarantee that if it does, it will contract for the Construction Phase with the CMAR selected for the Construction Document Phase"); at D000437-38, ¶ 2.5.8 (stating that the CMAR "shall develop the most logical, competitive, seamless, and distinct bid packages" and "shall bid these packages competitively"); D000441, ¶ 3.4 (stating the construction manager shall "assist in the selection, hiring, and contract approval of . . . [inter alia] general contractors"). If that process was conducted improperly, as Lusi alleges, then it will have suffered the requisite economic harm sufficient to confer standing. Whether or not Lusi is actually entitled to relief on the merits is a separate question, but it has alleged a sufficient injury in fact.
 C. Exhaustion of Administrative Remedies
Gilbane also alleges that Lusi failed to exhaust its administrative remedies with the DOA. The relevant statute provides that
 "Any actual or prospective bidder, offeror, or contractor who is aggrieved in connection with the solicitation or selection for award of a contract may file a protest with the chief purchasing officer. A protest or notice of other controversy must be filed promptly and in any event within two (2) calendar weeks after the aggrieved person knows or should have known of the facts giving rise thereto. . . ." Section 37-2-52(b) (emphasis added).
That protest must be in writing. Id. It is undisputed that Lusi never filed its protest until February 28, 2007. (Letter of Flanders to Najarian, Feb. 28, 2007, Ex. 11 to Lusi Resp. Mem., Apr. 11, 2007.)[19] Therefore, the facts giving rise to Lusi's case must have become apparent to Lusi no earlier than Feburary 14, 2007. *Page 24 
The record is unclear as to when Gilbane commenced and concluded the trade contractor bidding process. All that is known is that the Construction Document phase, including the trade contractor bidding process, concluded no later than March 26, 2007, when the Director of the DOA executed the amended Purchase Order accepting Gilbane's proposed GMP. (Najarian Aff. ¶ 3 and Ex. 5, Apr. 6, 2007.)
Mr. Lusi states that he attempted to pre-qualify as a bidder by e-mailing the required paperwork to a representative of Gilbane in November 2006. (Dep. of Armand P. Lusi, Apr. 4, 2007, Ex. 5 to Lusi Response Mem., Apr. 11, 2007.) He further stated that, according to a message generated by his e-mail program, his message was deleted by the recipient without being read. Id. at 70:3-6. Lusi also indicated that he spoke with a different representative of Gilbane "during the second or third week of February" in 2007. Id. at 65:20-66:25. In that latter conversation, he learned that Gilbane would not be seeking a general contractor bid. Id. at 68:11-69:7. Therefore, he contends that this is the date on which he knew that his attempt to bid on the URI project had failed.
Taking the facts in the light most favorable to Lusi, the Court finds Lusi may not have known about his alleged inability to bid on the URI project until mid-February. A greater factual record is necessary to develop the content of these conversations, any other relevant communications, as well as the time line surrounding Gilbane's trade contractor bidding process. Only then can the Court resolve the factual issues as to whether Lusi's bid protest was timely. *Page 25 
 D. Palpable Abuse of Discretion
Finally, Gilbane contends that no material issue of fact exists that Lusi cannot prove that a palpable abuse of discretion has occurred here, and that it is entitled to summary judgment as a result. As described above, the DOA proceeded under an invalid regulation in soliciting a CMAR, because no chief purchasing officer has deemed CMAR a feasible management method in any regulation, and because the regulations lack criteria to inform the purchasing agent as to which construction contracting management method ought to have been used for the URI project.[20]
One might be tempted to conclude that the DOA's act of proceeding under a regulation that was inconsistent with its statutory authority would be sufficient grounds, in and of itself, to grant Lusi the relief it requests.[21] See § 37-2-51 (stating that the decision of a purchasing official is entitled to a presumption of correctness, and shall not be disturbed unless it was, inter alia, "in violation of constitutional or statutory provisions" or "in excess of the statutory authority of the agency").
However, in Rhode Island, parties seeking to overturn the award of a state or municipal contract must meet the extraordinary burden of showing a "palpable abuse of discretion." See Blue Cross Blue Shieldv. Najarian, 865 A.2d 1074, 1084 (R.I. 2005) (reviewing Rhode Island jurisprudence on public contracts and concluding that "[t]o rise to a showing of palpable abuse of discretion . . . one must establish that not only were there violations of the law but also that those violations were significant"). This standard *Page 26 
sets a very high burden for plaintiffs seeking relief with respect to the award of a public contract, and a correspondingly low standard of statutory compliance by purchasing officials.
At a minimum, however, the invalidity of Regulation 8.11.2 is sufficient grounds to deny Gilbane's motion for summary judgment at this stage, pending a determination as to whether the violations in this case were sufficiently "significant" to entitle Lusi to the declaratory relief it seeks. See Najarian, 865 A.2d at 1084.
 Conclusion
After due consideration of the arguments advanced by counsel at oral argument and in their memoranda, the Court will grant Lusi's motion for summary judgment, and will enter a declaration that Regulation 8.11.2 is invalid because it purports to allow methods for construction contracting management, other than a general contractor, without identifying the methods which are deemed feasible. Further, the regulation is invalid because it fails to set forth criteria for choosing between alternative methods on a particular project. The Court will deny Gilbane's motion to dismiss, or in the alternative, for summary judgment. Prevailing counsel may present an order consistent herewith to the Court, which shall be settled after due notice to counsel of record.
[1] This acronym may also be used in this decision to refer to a particular construction manager at risk, depending upon the context.
[2] Lusi has only sought summary judgment on the invalidity of Regulation 8.11.2, although in its complaint, Lusi does seek relief with respect to the URI project. The Defendants contend that Lusi is not pressing its claims against the URI project as a strategic ploy to avoid the requirement of posting a bond to gain temporary injunctive relief.See Super. R. Civ. P. Rule 65(c); Truk Away v. Macera Bros.,643 A.2d 811, 816 (R.I. 1994) (requiring a bond, in order to insulate from harm a party who may be wrongfully enjoined, in all cases where a party seeks to enjoin an award of a state or municipal contract). In sum, the parties dispute the relevance of the URI project at this stage.
[3] Although obviously not binding upon this Court, the Massachusetts statute does provide a good general description of CMAR. In addition, Massachusetts also provides for another alternative method of delivery called "design build" in which a single contract provides for both the design and construction of a project. Mass. Gen. Laws. c. 149A §§ 14-20.
[4] According to the Weygand letter, in February 2005, the DOA issued a "Request for Proposals" seeking "Program Management Services" for the new building. Gilbane was selected to provide those services as Program Manager. However, the State decided to terminate its engagement with Gilbane as Program Manager and use a different construction management method.
[5] Competitive negotiation may be used only when the purchasing agent determines in writing, pursuant to properly issued regulations, that competitive sealed bidding is not practicable. Sections 37-2-18, 19.
[6] At a mandatory "pre-proposal conference," several firms were in attendance. Only three eventually submitted proposals. Lusi did not attend this conference. (Purchasing Record at D000423-24.)
[7] These cost spreadsheets also reveal the type of services contemplated by a CMAR contract because they describe the different personnel which will be utilized by the CMAR. (Purchasing Record at D000242.) These include directors, coordinators, accountants, engineers, schedulers, webmasters, etc. See id.
[8] The cost proposals for the management fee were $3,491,501; $3,576,746; and $4,130,266.
[9] This amount, when added to the $75,000 Construction Document award, equals the management fee submitted in Gilbane's cost proposal.
[10] Lusi has not indicated its intentions as to its other claims for relief. However, in its reply memorandum, Lusi characterized its motion as one for partial summary judgment, implying that it expected further proceedings to address the URI project.
[11] The Court also suggested that a trial justice could make a ruling or decision in order to create a thorough record, and then certify the question. Pierce, 770 A.2d at 870.
[12] A plaintiff need not have requested that the agency rule on the validity of its own regulation before bringing a declaratory judgment action. Section 42-35-7. Therefore, with respect to the challenge to Regulation 8.11.2, Gilbane's argument that Lusi failed to exhaust administrative remedies is without merit.
[13] Moreover, a challenge to a regulation which potentially affects every construction contract awarded by the State is likely of sufficient public importance to justify disregarding the standing requirement, as our Supreme Court has done from time to time. See Burns v. Sundlun,617 A.2d 114, 116 (R.I. 1992) (noting that "[o]n rare occasions this court has overlooked the standing requirement to determine the merits of a case of substantial public interest").
[14] In case there was any doubt, the statute specifically provides that "`shall' means imperative." Section 37-2-7(21).
[15] That regulation, quoted in full above, states that the "generally preferred method of construction contracting management for all projects shall be a general contractor. . . based upon a lump-sum, fixed fee contract type." Regulation 8.11.2. In order to use any other method, the agency requesting that method must justify its reasons in writing, and the purchasing agent may accept or reject that request. Seeid.
[16] Incidentally, Massachusetts has certain statutory criteria. For example, the project must be in excess of $5 million, and procedures must be in place to ensure competition and fairness at every stage in the procurement process. See Mass. Gen. Laws c. 149A § 1, 4.
[17] At the time of the complaint, the DOA had not yet accepted Gilbane's proposed GMP. That occurred on March 26, 2007. In its consideration of Gilbane's motion, the Court will consider whether Lusi might be entitled to any relief with respect to this decision of the DOA.
[18] Lusi also contends that it is entitled to the requested relief because the DOA failed to justify its decision to use competitive negotiation, as opposed to competitive sealed bidding, when it issued the RFP. See § 37-2-18, 19 (permitting the use of competitive negotiation only when competitive sealed bidding is determined to be impracticable). However, the Court will not entertain this argument because it pertains only to the choice of firms to serve as the CMAR, and Lusi admittedly had no interest in serving as the construction manager.
[19] That request was denied on April 9, 2007 (Letter of Najarian to Flanders, Apr. 9, 2007, Ex. 1 to Lusi Add'l Submission Mem., Apr. 16, 2007.) In her denial, Ms. Najarian stated that because the award to Gilbane was completed on June 15, 2006, the bid protest was untimely by over eight months. Id. The Court is not convinced that this is the relevant date on which Lusi knew or should have known about its grievance with respect to the construction phase of the URI project.
[20] It is undisputed that the DOA correctly followed the provisions of Regulation 8.11.2.
[21] Although Lusi has not moved for summary judgment with respect to the URI project, there is authority for awarding summary judgment to a non-moving party when there are no disputed material facts, and that party is entitled to judgment. See Thomas v. Ross, 477 A.2d 950, 953
(R.I. 1984) (finding it is proper to enter judgment in favor of a non-moving party, even in the absence of a cross-motion for summary judgment, if the requirements for summary judgment are met).